IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-00117-01-CR-W-DW |
| | ) | |
| JAMES T. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Smith's Motion to Suppress Any Items Taken During de Facto Arrest May 19, 2013 as No Arrest Warrant Produced or Given to Proper Party; and Motion to Suppress Any Alleged Statements Made, Made to or By Any Alleged Isle of Capri Security Personnel Prior to Any Presumed Miranda Warning to Alleged Defendant (doc #24). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On April 2, 1997, defendant James T. Smith was sentenced in the Western District of Wisconsin for the offense of Bank Robbery by Force or Violence. The sentence imposed was 210 months in custody followed by 36 months of supervised release. Defendant's term of supervised release began on April 23, 2012 and was to expire on April 22, 2015. On March 12, 2013, jurisdiction of the supervised release case was transferred from the Western District of Wisconsin to the Western District of Missouri. This case, 13-00061-01-CR-W-DW, was assigned to the Honorable Dean Whipple.

On May 20, 2013, a Violation Report was filed in Case No. 13-00061. The Violation Report stated that on May 19, 2013, troopers with the Missouri State Highway Patrol were notified that defendant Smith attempted to rob the Isle of Capri Casino. A mandatory condition of defendant Smith's supervised release was that "[t]he defendant shall not commit another federal, state or local crime." A warrant for the arrest of supervised releasee was issued for defendant Smith. Defendant Smith first appeared in the supervised release case (Case No. 13-00061) before United States Magistrate Judge Robert E. Larsen on May 21, 2013.

On April 29, 2014, a two-count Indictment in the instant case was filed. Count One of the Indictment charges that on May 18, 2013, defendant Smith committed bank robbery, taking money in the amount of $1,053.00 from a teller at Commerce Bank, 118 West 47th Street, Kansas City, Missouri. Count Two charges that on May 19, 2013, defendant Smith attempted to rob the Isle of Capri Casino.

On August 13, 2014, an evidentiary hearing was held on defendant's motion to suppress. Defendant Smith appeared pro se with Assistant Federal Public Defenders William J. Raymond and Carie Allen appearing as stand-by counsel. The Government was represented by Assistant United States Attorney Christina Y. Tabor. The Government called Marty Humbert, a security guard from the Isle of Capri Casino, Kyle Leroy, the security shift manager at the Isle of Capri Casino, Sergeant Brian Vernon, a Missouri State Trooper, and Sergeant James Schulte and Officer Doaa El-Ashkar of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits

the following proposed findings of fact:

1. On Sunday, May 19, 2013, Marty Humbert was working as a security guard at the Isle of Capri Casino. (Tr. at 3) Mr. Humbert was wearing a uniform with a badge on the shirt. (Tr. at 3) Mr. Humbert was not armed with a firearm and he was not provided with handcuffs. (Tr. at 4)

2. At approximately 12:13 a.m., Mr. Humbert was patrolling the parking lot of the casino when he received a radio dispatch regarding a patron. (Tr. at 3-4) Mr. Humbert was provided a description of the patron and told that if he saw him, he was to ask the patron if he would please wait for a supervisor to come out and speak with him. (Tr. at 4) Mr. Humbert knew that the security supervisor, Kyle Leroy, wanted to speak with the patron, but Humbert did not know what Leroy wanted to speak to the patron about. (Tr. at 5)

3. Mr. Humbert saw a person matching the physical description of the person the security supervisor wanted to speak with leaving the casino outside the doors of the welcome deck area. (Tr. at 5) The patron was later identified as James T. Smith. (Tr. at 5) Mr. Humbert got out of his car and asked the patron if he could wait for Humbert's supervisor to speak with him. (Tr. at 6) The patron asked Mr. Humbert why the supervisor wanted to speak with him. (Tr. at 6) Mr. Humbert replied that he did not know why. (Tr. at 6) Mr. Humbert radioed his supervisor to let him know that the patron was outside with him. (Tr. at 7) The patron (defendant Smith) stood in the parking lot and visited with Mr. Humbert until Mr. Leroy came out. (Tr. at 6) Mr. Humbert described defendant Smith as cooperative. (Tr. at 6) Mr. Humbert testified that he did not raise his voice, use any force or threaten defendant Smith in any way to gain his cooperation. (Tr. at 6-7) Mr. Leroy joined Mr. Humbert and defendant Smith in the parking lot. (Tr. at 7)

4. Mr. Leroy testified that he had received information that a patron presented a note to a cashier at the main cage requesting money and that the patron was then leaving the casino. (Tr. at 12) Mr. Leroy testified that surveillance video recordings captured the patron's activities at the main cashier cage and as the patron left the casino and as he walked into the parking lot. (Tr. at 12)

5. Mr. Leroy talked with defendant Smith in the parking lot. (Tr. at 12) Mr. Leroy asked defendant Smith if they had had some trouble getting him some money at the main cage. (Tr. at 12) Defendant Smith told Mr. Leroy that he had not gone to the main cage and that he did not understand why Leroy was asking him this quesion. (Tr. at 12-13) Mr. Leroy asked defendant Smith to wait a moment while he contacted surveillance to make sure that he was speaking with the correct patron. (Tr. at 13) Surveillance advised that they were certain that Mr. Leroy was talking to the right individual. (Tr. at 13) Mr. Leroy testified that he was dressed in a suit

3

jacket, polo and black pants and that he did not carry a weapon. (Tr. at 13-14) Mr. Leroy explained that he is security for the casino, not a law enforcement officer. (Tr. at 24) Mr. Leroy further testified that he did not threaten defendant Smith or use force of any kind against Smith while he was talking to him. (Tr. at 13)

6. Mr. Leroy testified that he interviewed the victim cashier that day. (Tr. at 14) The cashier reported that an individual had approached the main cage and presented her with a note requesting the money in her drawer. (Tr. at 14) The individual stated that he had nitroglycerin and would blow the place up. (Tr. at 14) The cashier had closed her drawer and contacted security without turning over any money to the patron. (Tr. at 25) The surveillance department reviewed the video of defendant Smith's exit from the casino and noted that Smith had possibly dropped the demand note over the railing next to the escalator he had come up. (Tr. at 14) A note was found in a trash can after being swept into a dustpan and dumped into the trash can. (Tr. at 15) The note read:

> I AM HERE TO COLLECT A DEBT. DO NOT MAKE A SCENE. EMPTY YOUR DRAWER LARGE BILLS, THANK YOU

(Government's Ex. 9) Mr. Leroy testified that this demand note was consistent with what the cashier reported to him. (Tr. at 16) Further, based on the surveillance video, Mr. Leroy determined that this demand note (Government's Ex. 9) was the note presented to the cashier. (Tr. at 20-21) A second note was found in the same trash can as the first note. (Tr. at 17) The second note read:

> I AM HERE TO COLLECT A DEBT EMPTY YOUR DRAWER LARGE BILLS, THIS ISNOTHING PERSONAL STRICTLY BUSINESS $25,000,00 dollars. DONOT MAKE A SCENE, THANK YOU.

(Government's Ex. 11) Both notes were written on check paper. (Tr. at 20-21)

7. Based on his investigation, Mr. Leroy concluded that defendant Smith had attempted a crime, that is attempted robbery. (Tr. at 22) Mr. Leroy contacted the Missouri Gaming Commission to report the crime. (Tr. at 22)

8. Sergeant Brian Vernon, a Missouri State Trooper and a member of the Missouri Gaming Commission, testified that as a member of the Missouri Gaming Commission, it is his responsibility to investigate criminal matters that occur at the Isle of Capri Casino. (Tr. at 26-27) Sergeant Vernon received information regarding James T. Smith's attempted robbery at the main cage at the Isle of Capri Casino from his supervisor. (Tr. at 27) Sergeant Vernon and another Trooper, Sergeant Doug Black, responded to 502 Maple, Apartment 3E, at approximately 5:00 p.m. on May 19, 2013. (Tr. at 27) 502 Maple, Apartment

3E, was the address defendant Smith had provided when he was detained following the attempted robbery earlier that day. (Tr. at 27-28)

9. Sergeant Vernon testified that he and Sergeant Black could hear voices coming from inside the apartment, but no one would answer the door. (Tr. at 28) Sergeant Vernon requested assistance from the Kansas City, Missouri Police Department because with just two officers, there was not sufficient manpower to secure all the exits to the building and be at the door to the apartment. (Tr. at 27-28) Sergeant Vernon and Sergeant Black secured the front and rear entrances to the building and waited for assistance. (Tr. at 29) When the Kansas City officers showed up, two of them stayed downstairs to secure the exits. (Tr. at 29) Sergeant Vernon, Sergeant Black and two other Kansas City officers went back to the door of the apartment. (Tr. at 29) The officers again knocked on the door, with no answer. (Tr. at 29) Sergeant Black looked out a window that was in the stairwell where he could see the balcony for the apartment and he saw defendant Smith sitting on the balcony. (Tr. at 29) Sergeant Black banged on the window and got defendant Smith's attention and told him to answer the door. (Tr. at 29)

10. Defendant Smith came to the door. (Tr. at 29) One of the Kansas City officers asked defendant Smith to come out and speak with the officers. (Tr. at 29-30) Defendant Smith stepped out of the apartment and Sergeant Vernon arrested Smith for attempting to rob the casino and placed him in handcuffs. (Tr. at 30) Sergeant Vernon had no arrest warrant. (Tr. at 30) Sergeant Vernon testified that he relied on the videotape of the incident, the statements of the cashier and the discovery of the demand note to establish probable cause for the arrest. (Tr. at 30) Sergeant Vernon took defendant Smith away from the apartment. (Tr. at 30) Sergeant Vernon had no conversation with the Kansas City police officers about searching the apartment. (Tr. at 30) The Kansas City police officers were still at the apartment when Sergeant Vernon left. (Tr. at 30)

11. Sergeant James Schulte of the Kansas City, Missouri Police Department testified that he was dispatched to 502 Maple, Apartment 3E, on a call for service to meet an officer in regard to an individual involved in an attempted robbery at the Isle of Capri Casino on that date and a robbery at the Commerce Bank off the Plaza on the previous day, May 18. (Tr. at 34) Sergeant Schulte testified that Officer Grinnick, Field Training Officer Finn and his training officer El-Ashkar also responded to the call. (Tr. at 35) Sergeant Schulte was present when the Highway Patrol officers arrested defendant Smith. (Tr. at 35) Sergeant Schulte testified that there was also a female, Valerie Hughes, in the apartment. (Tr. at 35-36)

12. Sergeant Schulte testified that after defendant Smith was taken into custody, Schulte stepped into the apartment and spoke with Ms. Hughes regarding what was going on. (Tr. at 36-37) Sergeant Schulte explained that the Kansas City officers

5

were there to assist the Highway Patrol officers in taking defendant Smith into custody. (Tr. at 37) Sergeant Schulte testified that he was just trying to calm the situation as these things can seem traumatic at the time. (Tr. at 37) Given the crimes with which defendant Smith was being charged, Sergeant Schulte thought it prudent to ask for consent to search the apartment for evidence. (Tr. at 42) Sergeant Schulte asked Ms. Hughes if she was the tenant there and she said she was and that it was her apartment. (Tr. at 42) Sergeant Schulte asked Ms. Hughes if the officers could go ahead and look for evidence regarding the crimes that defendant Smith was being accused of committing. (Tr. at 42)

13. A Kansas City, Missouri Police Department Consent to Search form was read to Ms. Hughes. (Tr. at 42) Ms. Hughes signed the Consent to Search form for the apartment at 5:31 p.m. (Tr. at 37, 39, 43) Sergeant Schulte testified that no force was used against Ms. Hughes to gain her consent to search the apartment. (Tr. at 43) The Consent to Search form for the apartment read:

> I, <u>Hughes, Valerie C</u> freely and voluntarily give my consent to members of the Kansas City, Missouri Police Department to conduct a search of: <u>502 Maple #3E</u> and seize any person, property, item, or substance determined by the Kansas City, Missouri Police Department to be relevant either to the matter under investigation or any criminal matter. I further authorize the taking of photographs and the making of video recordings and sketches of the property, items, substance or areas being searched.
>
> I understand that the Police Department has not obtained a search warrant authorizing this search and that I have a constitutional right to refuse permission to conduct the requested search. I also understand that any evidence found as a result of the search may be used against me in court.

(Government's Ex. 2) Ms. Hughes also signed a Consent to Search form for a 1994 Cadillac Seville. (Tr. at 38; Government's Ex. 3) Ms. Hughes advised that the vehicle was hers. (Tr. at 45) Sergeant Schulte testified that no force was used against Ms. Hughes to gain her consent to search the vehicle. (Tr. at 45)

14. Ms. Hughes was listed, along with defendant Smith, as a tenant on the lease for the apartment. (Tr. at 40; Government's Ex. 7) The officers did not have a copy of the lease on the scene. (Tr. at 46)

15. Officer Doaa El-Ashkar searched the apartment while Sergeant Schulte sat at the kitchen table with Ms. Hughes. (Tr. at 44) Officer El-Ashkar testified that she was searching for "clothing items, tennis shoes, fanny pack, items that Mr. Smith was wearing in the bank robbery, the Commerce Bank." (Tr. at 49) Officer El-Ashkar had responded to the Commerce Bank robbery on May 18 and had talked to the witnesses and viewed the surveillance video. (Tr. at 55) Officer El-Ashkar found two pairs of white tennis shoes lying on the floor in plain view in

a room in the apartment. (Tr. at 50-51) The door to the room was open. (Tr. at 51) Officer El-Ashkar was looking for white tennis shoes because of the suspect description and also because Officer El-Ashkar had seen the suspect wearing white tennis shoes on the video surveillance of the Commerce Bank robbery. (Tr. at 50) Officer El-Ashkar also seized a black fanny pack which was hanging inside a closet. (Tr. at 52) Officer El-Ashkar had seen the suspect wearing a black fanny pack on the video surveillance of the Commerce Bank robbery. (Tr. at 52) Inside the fanny pack, Officer El-Ashkar found multiple IDs and receipts for the Isle of Capri Casino. (Tr. at 52) The IDs and Isle of Capri Casino transaction receipts bore the name of defendant Smith. (Tr. at 52) Some of the IDs had defendant Smith's photograph on them. (Tr. at 52) No items were seized from the Cadillac Seville. (Tr. at 52)

16. Defendant Smith offered Document 41-1 from Case No. 13-00061-CR-W-DW, a Hold Harmless and Indemnity Agreement, as evidence "to show that there is no defendant in this case *per se*." (Tr. at 56-57)

### III. DISCUSSION

Defendant Smith seeks to suppress any items taken from 502 Maple Boulevard, Apt 3E following his arrest. (Motion to Suppress (doc #24) at 1) In support of his motion, defendant argues that there was no legal or lawful arrest warrant, no lawful search warrant and no consent from the proper party. (Id.) In addition, defendant argues that "[a]ny and all alleged prior convictions derived from prior plea agreements, within the State of New Jersey, must also be suppressed, as the present proceeding is completely barred by the previous written plea agreements between the defendant and other government agents in other jurisdictions." (Id. at 2) Finally, while the body of defendant's motion does not mention the suppression of statements, the title seeks to suppress any statements made by defendant to Isle of Capri security personnel prior to Miranda warnings. The Court will address each of defendant's arguments.

A. Statements

As set forth above, while the body of defendant's motion does not mention the suppression of statements, the title seeks to suppress any statements made by defendant to Isle of

7

Capri security personnel prior to Miranda warnings. The only evidence presented to the Court regarding defendant's statements consisted of the parking lot conversation between Marty Humbert, the Isle of Capri Casino security guard, and defendant Smith and then between Kyle Leroy, the security shift manager at the Isle of Capri Casino, and defendant Smith.[1]

No basis for suppression of these statements has been presented to the Court. Defendant's reference to Miranda warnings suggests that defendant believes that his statements should be suppressed because he received no Miranda warnings. However, Miranda warnings are only required when there is a "custodial interrogation," which is defined by the Supreme Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). The Isle of Capri security officers are not law enforcement officers. (See Fact No. 5, supra) As set forth in United States v. Bolden, 461 F.2d 998, 999 (8th Cir. 1972), Miranda warnings are not required before questioning by a private security officer because a private security officer is not a "law enforcement official." Further, defendant Smith was not taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda warnings were, therefore, not required and defendant's motion to suppress statements must be denied.

    B.    No Arrest Warrant

"A warrantless arrest by law enforcement is reasonable where there is probable cause to

---

[1] The government's response to defendant's motion suggests that defendant Smith was interviewed by Trooper Kyle Murphy and Sergeant Black of the Missouri Gaming Commission in a room at the casino from 12:31 to 12:40 a.m. on May 19, 2013. (Doc #32 at 4) No evidence relating to this interview was presented at the hearing. The government advised that it does not intend to introduce in its case-in-chief any statements made by defendant Smith to Trooper Murphy at the Isle of Capri Casino. (Id. at 10)

believe that someone has committed … a crime." United States v. Winarske, 715 F.3d 1063, 1066 (8th Cir. 2013)(citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004)). Sergeant Vernon testified that he relied on the videotape of the incident, the statements of the cashier and the discovery of the demand note to establish probable cause for the arrest. (See Fact No. 10, supra)

The Court finds that the officers had probable cause to arrest defendant Smith for attempted robbery. Defendant Smith's motion to suppress on the basis that there was no arrest warrant must be denied.

### C. No Search Warrant

"It is well established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement, United States v. Karo, 468 U.S. 705, 717 (1984), and that consent is 'one of the specifically established exceptions to the requirements of both a warrant and probable cause.' Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)." United States v. Jaras, 86 F.3d 383, 388 (5th Cir. 1996). See also United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006)("the Fourth Amendment does not prohibit the warrantless search of a person's home or other property if the police have obtained the voluntary consent of a third party with common authority over the premises or property").

#### 1. Voluntariness of Consent

The government bears the burden of proving that consent was voluntarily given. See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). In United States v. Willie, the court set forth the following guidance in judging the

voluntariness of a consent to search:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search. Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

In this case, after defendant Smith was taken into custody, Sergeant Schulte stepped into the apartment and spoke with Valerie Hughes regarding what was going on. (See Fact No. 12, supra) Sergeant Schulte explained that the Kansas City officers were there to assist the Highway Patrol officers in taking defendant Smith into custody. (Id.) Given the crimes with which defendant Smith was being charged, Sergeant Schulte thought it prudent to ask for consent to search the apartment for evidence. (Id.) Sergeant Schulte asked Ms. Hughes if the officers could go ahead and look for evidence regarding the crimes that defendant Smith was being accused of committing. (Id.) A Kansas City, Missouri Police Department Consent to Search form was read to Ms. Hughes. (See Fact No. 13, supra) The form advised, "I have a constitutional right to refuse permission to conduct the requested search." (Id.) Ms. Hughes signed the Consent to Search form for the apartment. (Id.) Sergeant Schulte testified that no force was used against Ms. Hughes to gain her consent to search the apartment. (Id.) Ms. Hughes also signed a Consent to Search form for a 1994 Cadillac Seville. (Id.) Sergeant Schulte testified that no force was

used against Ms. Hughes to gain her consent to search the vehicle. (Id.) Officer Doaa El-Ashkar searched the apartment while Sergeant Schulte sat at the kitchen table with Ms. Hughes. (See Fact No. 15, supra) No evidence was presented to indicate that Ms. Hughes did not understand what the officers were requesting. No evidence was presented to indicate that Ms. Hughes was under the influence of alcohol or drugs. No evidence was presented to indicate that Ms. Hughes made any objections while the officers were searching the residence.

Based on the evidence outlined above, the Court finds that Ms. Hughes was not coerced by the officers and was aware of her right to refuse consent. Ms. Hughes voluntarily and intentionally consented to a search of her residence. The Government has met its burden in establishing that Ms. Hughes' consent to search was freely and voluntarily given and not the result of duress or coercion.

2. Authority to Consent

The United States Supreme Court has recently stated that "[o]ur cases firmly establish that police officers may search jointly occupied premises if one of the occupants consents." Fernandez v. California, 134 S.Ct. 1126, 1129 (2014). The government has the burden of establishing the effectiveness of the third party's consent by demonstrating that the third party had either actual or apparent authority to consent to the search. See United States v. Davis, 332 F.3d 1163, 1169 (9th Cir. 2003). In United States v. Nichols, 574 F.3d 633, 636 (8th Cir. 2009), the court found that the defendant's cohabitant girlfriend had common authority to consent to a search of the residence even though she had no property interest in the residence.

In this case, prior to obtaining Valerie. Hughes' consent to search, Sergeant Schulte asked Ms. Hughes if she was the tenant there and she said she was and that it was her apartment. (See Fact No. 12, supra) The Court finds that Ms. Hughes had apparent, as well as actual, authority

11

over the entire residence. Ms. Hughes signed a Consent to Search "502 Maple #3E." (See Fact No. 13, supra) "The typical reasonable person would have understood this to mean every room, the sum of which is the house [i.e. the residence]." United States v. Fleck, 413 F.3d 883, 892 (8th Cir. 2005). See also United States v. Almeida-Perez, 549 F.3d 1162, 1172 (8th Cir. 2008) ("Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend so far.") The Government has met its burden in establishing the effectiveness of Ms. Hughes' consent.

       3.      Lack of Defendant Smith's Consent

The law is clear that "[w]hen officers obtain valid third-party consent, they are not also required to seek consent from a defendant, even if detained nearby." United States v. Amratiel, 622 F.3d 914, 917 (8th Cir. 2010)(citing United States v. Matlock, 415 U.S. 164, 171 (1974)). A "potential objector, nearby but not invited to take part in the threshold colloquy, loses out ... [s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." Georgia v. Randolph, 547 U.S. 103, 121 (2006). In Fernandez v. California, 134 S.Ct. 1126, 1134 (2014), the Court found that as long as the police had reasonable grounds for removing the potentially objecting tenant (such as placing him under arrest), the tenant stands in the same shoes as a tenant who is absent for any other reason.

Here, defendant Smith was not present at the residence when Sergeant Schulte obtained Valerie Hughes' consent to search. (See Fact Nos. 10 and 12, supra) There is no evidence to suggest that the officers removed defendant Smith from his residence so that he would not be present to object to a search of the residence. Rather, defendant Smith was arrested for attempting

to rob the casino and taken away by Sergeant Vernon. (See Fact No. 10, supra) As set forth in Amratiel, since the officers had the consent of Ms. Hughes, they were not required to also seek consent from defendant Smith. Defendant Smith's motion to suppress on the basis that there was "no lawful search warrant and no consent from the proper party" must be denied.

D.  Prior Convictions

Defendant's request that "[a]ny and all alleged prior convictions derived from prior plea agreements, within the State of New Jersey, must also be suppressed, as the present proceeding is completely barred by the previous written plea agreements between the defendant and other government agents in other jurisdictions" (Motion to Suppress (doc #24) at 2), is more appropriately deemed a motion in limine, rather than a request for the suppression of evidence based on a constitutional violation.

The government responds that defendant Smith's Wisconsin bank robbery conviction is admissible under Rule 404(b), Federal Rules of Evidence, "to show his method of operation and modus operandi and because it is similar to the charged crimes it is probative on the issue of identity." (Government's Response (doc #32) at 11) The government states that it has given defendant notice of its intent to offer the prior robbery conviction into evidence at trial under Rule 404(b).[2] (Id.)

---

[2]The Court notes on May 8, 2014, government counsel informed defendant Smith by letter that the following felony convictions may be used against him under Rule 404(b)(2):

> 1997 – Bank Robbery, 18 U.S.C. § 2113(a), *United States v. James T. Smith*, United States District Court for the Western District of Wisconsin, Case Number 96-CR-76-C-1, and *United States v. James T. Smith*, 131 F.3d 685 (7th Cir. 1997) … offered under Rule 404(b)(2), Fed.R.Evid., proving identity, motive, opportunity, intent, preparation, and common method of operation and common scheme and plan. The letter also notified defendant that the following felony convictions may also be used against him … under 404(b)(2), for the same proof, to wit: (1) Robbery, Cape May, NJ, sentenced September

Defendant Smith has provided no legitimate reasons for the Court to exclude the subject Rule 404(b) evidence. Thus, the Court finds that defendant's motion to suppress his prior convictions must be denied.

## IV. CONCLUSION

Given the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Smith's Motion to Suppress Any Items Taken During de Facto Arrest May 19, 2013 as No Arrest Warrant Produced or Given to Proper Party; and Motion to Suppress Any Alleged Statements Made, Made to or By Any Alleged Isle of Capri Security Personnel Prior to Any Presumed Miranda Warning to Alleged Defendant (doc #24).

Defendant Smith and counsel are reminded they have fourteen days after being served a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

/s/ *Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE

---

26, 1986, to five years custody; (2) Robbery, Cape May, NJ, sentenced May 9, 1986, to seven years prison, (3) Bank Robbery, Theft, Cape May Co., NJ, sentenced May 16, 1986, to five years prison consecutive.

(Government's Notice of Discovery (doc #12) at 1-2)